Filed 3/26/24  Preservation of Benefit Plan Retirees Assn. v. City of San Jose CA6

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRESERVATION OF BENEFIT PLAN RETIREES ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN JOSE et al., <br><br> Defendants and Respondents. | H049387 <br> (Santa Clara County <br> Super. Ct. No. 17CV312610) <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> **NO CHANGE IN JUDGMENT** |
| EVET LOEWEN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SAN JOSE et al., <br><br> Defendants and Respondents. | H050036 <br> (Santa Clara County <br> Super. Ct. No. 17CV312610) <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> **NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on February 28, 2024, be modified as follows:

1. On pages 25, line 26, the sentence starting with "There is no evidence" is deleted and the following sentences are inserted in its place:

The footnote does not show that the impact was the loss of grandfathered rights, much less that the six plaintiffs at issue here suffered a loss.  Plaintiffs point to other evidence

that their grandfathered benefits were not calculated, but they did not cite this evidence in their trial court briefing, and therefore we do not consider it.

There is no change in judgement.

Appellants' petition for rehearing is denied.

_____
BROMBERG, J.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.


_____
DANNER, J.


*Preservation of Benefit Plan Retirees Association et al. v. City of San Jose et al./*
*Loewen v. City of San Jose*
H049387/H050036

Filed 2/28/24  Preservation of Benefit Plan Retirees Assn. v. City of San Jose CA6 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRESERVATION OF BENEFIT PLAN RETIREES ASSOCIATION, et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants and Respondents. | H049387<br>(Santa Clara County<br>Super. Ct. No. 17CV312610) |
| EVET LOEWEN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants and Respondents. | H050036<br>(Santa Clara County<br>Super. Ct. No. 17CV312610) |

In this case, 17 retirees, the beneficiaries of two deceased retirees, and a non-profit corporation representing the retirees (Plaintiffs)[1] claim that their former employer, the

---

[1] The 17 retired employees are Joseph Bass, Lawrence Castellano, Richard Coco, Leslye Corsiglia, Harry Freitas, Danny Jordan, Evet Loewen, David Maas, Barry Ng, Anita Phagan, George Rios, Gary Schoennauer, Ken Tanase, Wayne Tanda, Randal Turner, Steven Turner, and Robert Wilson.  Linda Horwedel is the beneficiary of Joseph Horwedel, a deceased retiree, and Sheila Hughes is the beneficiary of William Hughes, another deceased retiree.  (In January 2024, this court granted Sheila Hughes's motion to substitute in for her deceased husband William, who passed away while this appeal was
(continued)

City of San José (City), failed to pay them a significant portion of pensions that had vested. Alternatively, Plaintiffs claim that, due to misrepresentations and omissions about their pensions, they were unfairly surprised by the imposition, in some cases after more than two decades of retirement, of limits on their pensions. Plaintiffs therefore sued the City, the city manager, and the Board of Administration of the Federated City Employees Retirement System (Board) for unconstitutional impairment of their pension rights, as well as various estoppel, breach of fiduciary duty, and fraud-like claims.

The trial court granted summary judgment for defendants on Plaintiffs' impairment claims because in 1989 the City passed Ordinance No. 23283 (1989 Ordinance) incorporating then-recently imposed federal limits on payments from qualified defined benefit plans of state and local governments. (San José Ord. No. 23283, § 2, adding San José Mun. Code. § 3.28.955.) Because the 1989 Ordinance contained a "grandfather" clause preserving the pension rights of existing employees, the court ruled that, even though the ordinance reduced payments that Plaintiffs otherwise would have received, subsequent implementation of these limits did not violate Plaintiffs' vested rights. The trial court also granted summary judgment on Plaintiffs' estoppel, fiduciary duty, and other remaining claims alleging misrepresentations and omissions concerning the limits on their pension benefits. The court ruled that it was barred from considering the merits of these claims of all but one of the Plaintiffs (Evet Loewen) because they had failed to satisfy the threshold requirement of timely presenting their claims to the City under the Government Claims Act (Gov. Code, § 900 et seq.). After the other Plaintiffs

---

pending.) The Preservation of Benefit Plan Retirees Association (POBPRA) is a non-profit mutual benefit corporation representing the individual plaintiffs. Nona Tobin, who was also a plaintiff below, has filed a separate appeal in case No. H049987 *Tobin v. City of San José*. Tobin's appeal is addressed in a separate opinion filed concurrently with this opinion.

2

appealed, Loewen dismissed her remaining claims and filed her own appeal, which we ordered considered together with the first appeal for oral argument and disposition.[2]

We conclude that we lack jurisdiction over a portion of Loewen's appeal and that Plaintiffs have abandoned their appeals from the judgments in favor of the city manager and the Board. We also conclude that the trial court correctly granted summary judgment on the claims against the City. Plaintiffs' impairment claims fail because the 1989 Ordinance imposed limits on the pension allowances received by retirees, not a mere "tax-qualification payment cap," and therefore subsequent implementation of those limits did not impair any rights of Plaintiffs that had vested. In addition, we agree that the merits of Plaintiffs' claims of misrepresentations and omissions by the City cannot be reached because Plaintiffs failed to satisfy the threshold requirement of presenting a timely government claim to the City and that these claims are not saved by either the continuous accrual doctrine or the tolling agreements some Plaintiffs had with the Board.

Accordingly, we dismiss Loewen's appeal with respect to the judgment in favor of the Board and otherwise affirm the judgments against Plaintiffs.

## I.   BACKGROUND

The Federated Cities Employees Retirement System (FCERS) operates a defined benefit pension plan with over 7,600 members. (San Jose Mun. Code, § 3.28.010; see also 6 Mertens Law of Fed. Income Taxation (2023) § 25B:5 [discussing qualified defined benefit pension plans].) Plaintiffs include 17 members of the FCERS plan and two beneficiaries of deceased members. These members all retired between the ages of 49 and 58, most with 30 or more years of service, and they or their beneficiaries are receiving pension benefits under the FCERS plan.

---

[2] This court also granted leave to Robert Davis and the San Jose Retired Employees Association to file amicus briefs in support of Plaintiffs.

3

Below we describe the FCERS plan, the reductions that the City made in Plaintiffs' retirement benefits starting in 2014, and Plaintiffs' challenges to those reductions.

A.  *The FCERS Plan*

1.  The Basics

The FCERS plan, which the Board administers, covers most City employees besides public safety officers, the mayor, and city council members. (San José Mun. Code, §§ 3.28.400-3.28.560.) Under the plan, both the City and individual plan members make contributions (*id.*, §§ 3.28.010, 3.28.700-3.28.960), and after retirement members are entitled to receive "from the retirement fund" monthly pension payments based on their years of service and a percentage of their final compensation (*id.*, § 3.28.1110, subd. (C)). When the FCERS plan was adopted in 1975, payments from the retirement fund were calculated using the following formula: "two and one-half percent (2.5%) of [the member's] final compensation times the number of years of federated City service for which he [or she] is entitled to credit," provided the annual allowance "shall never exceed a maximum of seventy-five percent (75%)" of final compensation. (San José Ord. No. 17739, § 4 [adopted May 27, 1975]; see also San José Mun. Code, former § 2904.1401 [retirement formula].)

The FCERS plan also provides cost-of-living adjustments (COLA's). (San Jose Mun. Code, § 3.44.030.) Starting in 1981, the COLA was tied to the consumer price index for the San Francisco-Oakland area but capped at 3 percent a year, with "banking" of unused amounts in excess of that level for use in future years in which the index falls below that level. (San José Ord. No. 20064.)

4

## 2. The 1989 Ordinance

The City enacted the 1989 Ordinance in response to legislation by Congress the year before. In 1988, Congress amended section 415 of the Internal Revenue Code[3] (Section 415), which was enacted as part of the Employee Retirement Income Security Act of 1974 (ERISA, 26 U.S.C. § 1001 et seq.), to impose new limits on qualified defined benefit plans of state and local governments. Before the amendment, such government plans apparently were subject to more lenient limits than private plans. In 1988, however, Congress amended Section 415 to extend the limits on private plans to state and local government plans. (Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647 (Nov. 10, 1988) 102 Stat. 3342, § 6054.) Congress, however, included a "grandfather" clause in Section 415 allowing state and local government plans to elect to pay pre-1990 members benefits "determined without regard to any amendment of the plan made after October 14, 1987." (§ 415(b)(10)(A) & (B).)

To preserve the important tax advantages enjoyed by qualified defined benefit plans (see, e.g., 1 Bender's Federal Income Taxation on Retirement Plans (2023) § 4.07[2] (Bender's)), the City's personnel director advised the mayor and the city council to enact an ordinance incorporating Section 415's newly extended limit for post-1990 members so that "no employee hired on or after January 1, 1990 will receive retirement benefits in excess of the 415 limit," as well as adding a grandfather clause allowing pre-1990 members to receive the pension payments previously promised them. In so doing, the director noted that, "[s]ince retirement benefits are subject to the Meet and Confer process," he had discussed the proposal with employee groups.

The San José City Council adopted the 1989 Ordinance on November 14, 1989, which became effective the following month. (San José Ord. No. 23283.) The 1989 Ordinance amended chapter 3.28 of the San José Municipal Code, which governs the

---

[3] The Internal Revenue Code is found at title 26 of the United States Code.

FCERS, by adding section 3.28.955, which is entitled "Benefit Limitations," to the "Benefits Generally" part of the FCERS plan. (San José Ord. No. 23283, § 2, amending San José Mun. Code, ch. 3.28, pt. 8.) Subdivision (A) of this new section incorporated Section 415's limit on payments to post-1990 members: "[T]he benefits payable to any person who becomes a member of [the FCERS] on or after January 1, 1990, shall be subject to the limitations set forth in Section 415 . . . ." (San José Ord. No. 23283, § 2, adding San José Mun. Code, former § 3.28.955, subd. (A).) Subdivision (B) in turn adopted Section 415's "grandfather" clause for pre-1990 members: "[T]he benefits payable to any person who becomes a member of [the FCERS] prior to January 1, 1990 shall be subject to the greater of the following limitations as provided in Section 415(b)(10) of the Internal Revenue Code: [¶] 1. The limitations set forth in Section 415 of the Internal Revenue Code; or [¶] 2. The accrued benefit of the member without regard to any benefit increase pursuant to any amendment of [the FCERS plan] adopted after October 14, 1987." (San José Ord. No. 23283, § 2; San José Mun. Code, former § 3.28.955, subd. (B).)

3. The Handbooks

A 1995 handbook prepared by FCERS for its members explained how the 1989 Ordinance affected payments to retirees. The handbook explained that limits imposed by Congress "may reduce the allowances and benefits you would otherwise receive from the City after you retire." In particular, the handbook continued, pre-1990 members "will receive at least" the benefits "under the formula in effect on October 14, 1987," and if higher, they "will receive the lesser of" the benefits under the formula in effect at their retirement and the "maximum allowed by [Section] 415 for your age at retirement." The handbook also informed post-1990 members that "your retirement allowance will be the lower" of the benefit under the formula in effect on retirement and the "the dollar limit set by Section 415." (Boldface & underscoring omitted.) The 1997 and 2004 handbooks included similar statements.

6

4.    The 2001 Change in "Final Compensation"

In 2001, the City increased benefits under the FCERS plan by changing the definition of "final compensation," which, as noted above, is one of the terms used in the formula for calculating pension benefits.  (San José Ord. No. 26353, [adopted May 15, 2001], amending San José Mun. Code, § 3.28.030; see also San José Mun. Code, § 3.28.030.11 [definition of final compensation].)  Previously, final compensation had been defined as the highest average annual compensation earned over "three consecutive years" of service.  For those retiring after July 1, 2001, the City changed the definition of the term to the highest annual average in "any twelve consecutive months."  (San José Ord. No. 26353, amending San José Mun. Code, § 3.28.030.11, subd. (B).)

5.    The 2006 COLA Increase

In 2006, the City increased retirement benefits again, this time by changing the COLA formula.  Previously, COLA payments had equaled the actual increase in the consumer price index for the San Francisco-Oakland area up to a maximum of 3 percent with banking usable in later years when the increase was less than 3 percent.  In February 2006, the City passed an ordinance adopting a COLA of a flat 3 percent per year.  (San José Ord. No. 27652, amending San José Mun. Code by adding § 3.44.160; see also San José Mun. Code, § 3.44.160, subd. (A)(1).)

6.    The 2011 Ordinance

On February 15, 2011, the city council enacted San José Ordinance No. 28885 (2011 Ordinance).  Earlier, the City had decided to seek an Internal Revenue Service (IRS) determination that the FCERS plan was a qualified[4] defined benefit plan.  To

---

[4]  To be deemed "qualified," a pension plan must comply with more than three dozen statutory requirements (see 26 U.S.C. § 415(a)(1)-(38)), as well as related regulations.  (1 Bender's, *supra*, § 4.07[2].)  Qualified deferred compensation plans enjoy several advantages: "immediate employer deduction for contributions to the plan; tax-exempt accumulation of investment income by the plan; [and] tax liability to the participant only upon benefit distribution."  (*Ibid.*)

7

prepare, the City's outside tax counsel recommended a series of amendments to the FCERS plan, which the city attorney informed the mayor, and the city council were "primarily technical in nature" and designed to ensure the plan contained the "very specific language that [the IRS] wants to see." In addition, with respect to the proposed amendments to San José Municipal Code section 3.28.955, the provision concerning Section 415's limits, the city attorney informed the mayor and the city council that "[t]hese amendments should have no impact on Plan or System operations."

The amendments to section 3.28.955 in 2011 left the subsection concerning post-1990 members largely untouched, adding only a reference to subsequent subsections. (San José Ord. No. 28885, § 21, amending San José Mun. Code, § 3.28.955, subd. (A).[5]) The amendments to the subsection concerning pre-1990 members simplified it. Rather than stating that such members would receive the greater of the "limitations set forth in Section 415" and the accrued benefit "without regard to any benefit increases pursuant to any amendment of this System adopted after October 14, 1987" (San José Ord. No. 23283, § 2; San José Mun. Code, former § 3.28.955, subd. (B)), the amended subsection stated that "the 415(b) limit shall not be less than the accrued benefit of the member under this system determined without regard to any amendment of the plan made after October 14, 1987." (San José Ord. No. 28885, § 21, amending San José Mun. Code, former § 3.28.955, subd. (B).) The 2011 Ordinance also added provisions detailing how to calculate the "415(b) limitation" (San José Mun. Code, § 3.28.955, subds. (E)-(K)), and provisions addressing subjects such as service credit purchases and participation in other plans (*id.,* § 3.28.955, subds. (L)-(Q)).

_____

[5] As amended, subsection (A) provides in full: "Notwithstanding any other law, except as provided in Subsections B. and E. below, the benefits payable to any person who becomes a member of this system on or after January 1, 1990, shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code as applied (other than paragraph (b)(2)(G)) without regard to paragraph (b)(2)(F) of said Section 415." (San José Mun. Code, § 3.28.955, subd. (A).)

B. *Implementation of the Section 415 Limits*

In 2014, the Board discovered that 12 FCERS participants had received retirement benefits exceeding the limits imposed by Section 415 under the 1989 Ordinance.[6] In April 2014, the Department of Retirement Services, which helps administer the FCERS, sent letters to 10 of these participants informing them that the IRS "limits the annual maximum retirement benefit retirees are entitled to receive[] under . . . Section 415(b)" and that they "may have been overpaid retirement benefits in the past, and may still be receiving payments in excess of the legal limit." The letters also stated that, pending further analysis, "we must hold benefit payments at their current levels. This means that we will not apply the annual COLA scheduled to be added to your benefit as of April 30, 2014." In 2014 or early 2015, other plaintiffs were informed that benefits might be reduced due to Section 415's limits or were asked to sign information sheets recognizing that possibility.

In addition, starting in 2014, Plaintiffs' pension benefits were reduced. Their monthly "payment stubs" detailed the reductions. Specifically, the stubs indicated the "Base Amount" to which each plaintiff was entitled and contained adjustments for the "COLA," including a deduction for "415 Reduction COLA" or "415ReductCOLA."

In September 2014, Board representatives met with some plaintiffs and presented them with tolling agreements. Eight plaintiffs—Lawrence Castellano, Richard Coco, Anita Phagan, George Rios, Gary Schoennauer, Wayne Tanda, Randal Turner, and Robert Wilson—signed agreements. These agreements were between individual retirees

---

[6] Ten of the 12 participants—Joseph Bass, Lawrence Castellano, Richard Coco, Danny Jordan, George Rios, Gary Schoenauer, Wayne Tanda, Randal Turner, Steven Turner, and Robert Wilson—are currently plaintiffs. Another participant, David Boggini, was named in the original petition and complaint, but later abandoned his claims. The final participant identified by the Board, Robert Valerio, does not appear to have been a plaintiff.

and the "Board of Administration ('Board') of the Federated City Employees' Retirement System," and were signed on the Board's behalf by Roberto Peña, director of the Department of Retirement Services. The agreements tolled any "statute of limitations, laches or other time-bar defenses" concerning disputes over the "415 limits" on retirement benefits until 60 days after written termination.

The City and the Board were urged to adopt an excess benefit plan to pay benefits exceeding Section 415(b)'s limits. Such excess benefit plans are authorized by Section 415(m), which Congress enacted in 1996. (Small Business Job Protection Act of 1996, Pub. L. No. 104-188 (Aug. 20, 1996) 110 Stat. 1755, 1809-1810.) Other cities, as well as public employee retirement programs such as the California Public Employees Retirement System, have adopted such plans. In 2004, the Board forwarded a report on adopting an excess benefit plan to the City and labor officials, but nothing came of the report. In May 2015, the City again declined to explore an excess benefit plan.

On July 21, 2016, the plaintiffs who had signed the tolling agreements gave written notification of termination of their agreements.

### C.    *Plaintiffs' Government Claims and the Trial Court Proceedings*

#### 1.    The Government Claim

In November 2016, POBPRA and all the individual Plaintiffs[7] except Harry Freitas and Barry Ng filed a joint government claim against the City. On January 11, 2017, the City, which was not a party to the tolling agreements, rejected the claim as untimely.

#### 2.    The Initial Petition and Complaint

In July 2017, Plaintiffs and three other individuals filed a petition for writ of mandate and complaint. The petition named as respondents the City, the Board, and then-city manager Norberto Dueñas in his official capacity (Defendants).

_____

[7] For purposes of the description of the procedural history, Joseph Horwedel and William Hughes, rather than their surviving spouses, are included in the term "Plaintiffs."

10

The first count of the petition was for unconstitutional impairment of contract. There were two other impairment counts as well, one by six plaintiffs for allegedly terminating their "grandfathered status" and another for misclassification. The petition also contained claims for equitable estoppel, promissory estoppel, and breach of fiduciary duty. The final count claimed a bill of attainder.

Defendants moved for judgment on the pleadings, which the trial court granted in part. It dismissed the impairment by misclassification count, which Plaintiffs withdrew, and the bill of attainder count, which the court concluded failed to state a claim. The court also ruled that the estoppel and breach of fiduciary duty claims by 19 plaintiffs (but not Evet Loewen) against the City and the Board were barred because these plaintiffs had failed to file a timely government claim against either. The court, however, granted leave to amend the estoppel and breach of fiduciary duty claims.

### 3. The First Amended Petition

The first amended petition dropped two parties, David Boggini and Michael Guisti, as well as the misclassification and attainder claims. Defendants filed demurrers, which the trial court again overruled on the impairment count. However, based on the failure to file a timely government claim, the Court sustained the demurrers with respect to the Board on the remaining counts and with respect to the City on the remaining counts against all plaintiffs except Evet Loewen and Nona Tobin (who has filed a separate appeal).

### 4. The Second and Third Amended Petitions

In light of the retirement of Freitas and Ng, the trial court allowed Plaintiffs to file a second amended petition, but granted a motion to strike the previously dismissed claims as well as new allegations of breach of contract. Accordingly, Plaintiffs filed a third amended petition, the now operative pleading. In that petition, Plaintiffs named David Sykes, who by that time had replaced Norberto Dueñas, as city manager, in his official capacity as a respondent and defendant.

11

### 5. Summary Judgment

In March 2021, Defendants moved for summary judgment. Plaintiffs (and Tobin) opposed the motion. After holding oral argument, the trial court granted summary judgment in an order, which was later amended to correct a minor technical error.

In the amended summary judgment order, the trial court denied Plaintiffs' impairment claim based upon the 1989 Ordinance. Rejecting Plaintiffs' contention that this ordinance imposed only a "tax-qualification limit[]," the trial court concluded that the ordinance imposed caps on pension payments to retirees. Because the ordinance included a grandfather clause under Section 415, the court ruled that the City had preserved the vested rights of pre-1990 members and there was no impairment of those rights. In addition, because the 1989 Ordinance imposed Section 415's limits on future members, the court concluded that the three plaintiffs who joined the plan after the 1989 Ordinance became effective on January 1, 1990 could not establish impairment either.

The trial court also extended its previous rulings concerning the timeliness of the Plaintiffs' government claim to the city manager, who did not demur to the first amended petition on that ground, and it ruled that the remaining claims of all plaintiffs except Loewen and Tobin were barred because they had failed to satisfy the threshold requirement of presenting a timely claim under the Government Claims Act.

Accordingly, the trial court granted summary judgment against all plaintiffs except Loewen and Tobin, and with respect to those two, it granted summary adjudication on their impairment claims.

### 5. The July 2021 Judgment

On July 19, 2021, the trial court entered judgment in favor of the Board against all plaintiffs. The court also entered judgment in favor of the City and the city manager against POBPRA and 17 individual plaintiffs whom the court listed by name. This list omitted Bass, as well as Loewen and Tobin, even though the court had granted summary judgment against all plaintiffs except Loewen and Tobin.

12

On August 26, 2021, Plaintiffs filed a timely notice of appeal from the July 19, 2021 judgment. Although all plaintiffs initially joined in the notice of appeal, a subsequently filed amended notice of appeal deleted Loewen and Tobin (but not Bass).

### 6. Dismissal of Loewen's Claims

In March 2022, Loewen voluntarily dismissed with prejudice her estoppel and breach of fiduciary duty claims. As Loewen had not brought any additional claims, on March 22, 2022, the trial court entered judgment against Loewen and in favor of the City and the city manager. On May 5, 2022, Loewen filed a notice of appeal.

## II. DISCUSSION

### A. *Preliminary Matters*

Before reaching the merits, several preliminary matters must be addressed.

### 1. Bass's Appeal

Joseph Bass is one of the plaintiffs that noticed an appeal from the July 19, 2021 judgment. However, that judgment does not include Bass in the list of plaintiffs against whom it was entered. As the trial court earlier had granted summary judgment against all plaintiffs "with the exception of Loewen and Tobin," this omission appears inadvertent. When asked, the parties agreed that the omission of Bass was unintentional, and Defendants asked this court to amend the judgment. Accordingly, we exercise our authority to correct inadvertent errors in judgments and conclude that the judgment against Bass is a final judgment over which we have appellate jurisdiction. (See, e.g., *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 308 ["When 'the trial court's failure to dispose of all causes of action results from inadvertence or mistake rather than an intention to retain the remaining causes of action for trial' [citation], the appellate court has discretion to 'preserve the appeal by amending the judgment to reflect the manifest intent of the trial court' "].)

13

## 2. Loewen's Appeal Concerning the Board

The Board argues that this court lacks jurisdiction to hear Evet Loewen's appeal from the judgment against her in favor of the Board because Loewen did not timely appeal that judgment. We agree.

The trial court entered judgment in favor of the Board against all plaintiffs in July 2021, and notice of entry of the judgment was served the following day, starting the clock running on any appeals. A timely notice of appeal by all Plaintiffs, including Loewen, was filed on August 26, 2021. However, on September 2, 2021, Plaintiffs filed an amended notice of appeal that deleted Loewen. (The trial court did not grant judgment to the City and the city manager against Loewen, presumably because she was not denied pension benefits until April 2016, and therefore her government claim against the City was timely.) On May 5, 2022, after she voluntarily dismissed her claims against the City and the city manager, and the trial court entered a judgment against her in favor of the City and the city manager, Loewen filed another notice of appeal.

It is not clear whether this final notice of appeal seeks review of the judgment in favor of the Board. The notice of appeal is from the March 22, 2022 judgment. That document decrees that "[j]udgment is hereby entered in favor of the City and the City Manager"—but not the Board—"and against Loewen" on her impairment claim. However, the document also states that a judgment was entered in favor of the Board on July 18, 2021, and it attaches that earlier judgment as an exhibit. In addition, Loewen's final notice of appeal lists the Board as a respondent. As a consequence, Loewen appears to have attempted to appeal the judgment in favor of the Board as well as the judgment in favor of the City and the city manager.

14

To the extent that Loewen sought to appeal the judgment in favor of the Board, her appeal was untimely.[8] In multiparty cases, a judgment leaving no issues to be determined concerning a party is final as to that party (see, e.g., *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 759 (*Baycol*)) and therefore immediately appealable. (See, e.g., *Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 991.) As Loewen was served with notice of entry of the judgment in favor of the Board on July 20, 2021, she had 60 days from that date—or until September 18, 2021—to notice an appeal from that judgment. (Cal. Rules of Court, rule 8.104(a)(1)(B).) Although Loewen originally filed a notice of appeal within that time period, she abandoned that appeal (*Dow v. Superior Court* (1956) 140 Cal.App.2d 399, 401-402), and did not file another one until May 2022, well outside the 60-day period. Consequently, Loewen's appeal from the judgment in favor of the Board is untimely, and it must be dismissed for lack of jurisdiction. (*Baycol, supra*, 51 Cal.4th at p. 761, fn. 8; *Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666-667.)

### 3. The Requests for Summary Affirmance

The Board and the city manager request summary affirmance because Plaintiffs have not challenged the judgments in their favor. Here again, we agree. In their opening briefs, Plaintiffs challenge the summary judgment granted to "Respondent City of San Jose" but not the judgments in favor of the Board and the city manager, and, in moving to consolidate their appeals, Plaintiffs represented that "[n]one of Appellants, including Ms. Loewen, are appealing judgments in favor of Respondent Board of Administration." The city manager also has informed us—without dispute by Plaintiffs—that the opening brief filed by the Plaintiffs other than Loewen does not even reference the city manager. Finally, when the Board and the city manager moved for summary affirmance, Plaintiffs

---

[8]  Loewen's counsel represented at oral argument that Loewen, like the other plaintiffs, is not appealing the judgment against the Board. We nonetheless address the timeliness of her appeal as to the Board because it concerns our jurisdiction and was raised in the briefs.

15

responded that they did not oppose the motion and "would have stipulated that they are not appealing judgments in favor of Respondent Board of Administration, or David Sykes in his capacity as City Manager."

Accordingly, we conclude that Plaintiffs have abandoned their appeals from the judgments in favor of the Board and the city manager and affirm the judgments as to those defendants. (See, e.g., *GetFugu, Inc. v. Patton Boggs* (2013) 220 Cal.App.4th 141, 150 [affirming order concerning defendants not addressed on appeal]; *Mecchi v. Picchi* (1966) 245 Cal.App.2d 470, 475 [affirming judgment for respondent not addressed on appeal].)

### B. *The Impairment Claim*

Plaintiffs' primary claim is for unconstitutional impairment of contract. As Plaintiffs acknowledged in the trial court, this claim is predicated on the assertion that the City did not impose limits on payments to FCERS members until at least 2011. The trial court rejected this assertion. It concluded that the City imposed limits on payments in the 1989 Ordinance, and because those limits operated only prospectively, they did not impair any vested pension rights. Reviewing this ruling de novo (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860), we agree.

The California Constitution's contract clause prohibits laws "impairing the obligation of contracts." (Cal. Const., art. I, § 9.) "[W]hen a public employee renders service under a pension statute, 'the pension provisions become a part of the contemplated compensation for those services and so in a sense a part of the contract of employment itself.' " (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1077 (*Alameda County*); see *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 853.) Consequently, the California Supreme Court has long recognized that the contract clause bars public employers from modifying pension ordinances in ways that substantially impair vested pension rights without

16

adequate justification. (*Alameda County*, at pp. 1074-1084; *Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131 (*Allen I*).)

Nonetheless, "[c]ontract clause protection of the terms and conditions of public employment historically has been the exception, rather than the rule." (*Cal Fire Local 2881 v. California Public Employees' Retirement Sys.* (2019) 6 Cal.5th 965, 977 (*Cal Fire*).) " '[T]he terms and conditions of public employment . . . generally are established by statute or other comparable enactment (e.g., charter provision or ordinance) rather than by contract.' " (*Ibid.*) Consequently, no public employee has " 'a vested contractual right . . . contrary to the terms and conditions fixed by law' [citation]" (*ibid.*), and "the contract clause does not protect public employees against adverse changes in the manner in which a pension plan is implemented that are authorized by the existing terms of the plan . . . ." (*Alameda County*, *supra*, 9 Cal.5th at p. 1083.) In other words, the contract clause is not violated when a city reduces pension benefits "*pursuant to* the charter and ordinances which delineate [the city's] retirement system and prescribe the employees' vested rights." (*International Assn. of Firefighters v. City of San Diego* (1983) 34 Cal.3d 292, 302 (*International Assn. of Firefighters*).)

Here, the trial court ruled that there was no contract clause violation because the individual plaintiffs' pension benefits were reduced under payment caps adopted in the 1989 Ordinance that preserved the previously vested rights of FCERS plan members. Plaintiffs challenge this ruling on the ground that the ordinance did not impose a payment cap and argue they have raised triable issues. These arguments are unpersuasive.

1.    The 1989 Ordinance

Plaintiffs assert that the 1989 Ordinance "imposed only a tax-qualification payment cap, not a total payment cap." This assertion is contradicted by the plain language and history of the ordinance.

The 1989 Ordinance was enacted in response to federal legislation the year before extending limits on payments from private defined benefit plans to government plans

17

such as the FCERS plan.  In response, the 1989 Ordinance added a new provision to the San Jose Municipal Code entitled "<u>Benefit Limitations</u>."  (San José Ord. No. 23283, § 2, adding San José Mun. Code, former § 3.28.955.[9])  The first subsection of this new provision limited the benefits payable to post-1990 FCERS members to those permitted by Section 415:  "A. . . .  [T]he benefits payable to any person who becomes a member of this System on or after January 1, 1990, shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code . . . ."  (San José Ord. No. 23283, § 2; San José Mun. Code, former § 3.28.955, subd. (A).)  The second subsection "grandfathered" pre-1990 members, allowing them to receive the greater of (1) "[t]he limitations set forth in Section 415 of the Internal Revenue Code" or (2) "[t]he accrued benefit of the member without regard to any benefit increases pursuant to any amendment of this System adopted after October 14, 1987."  (San José Ord. No. 23283, § 2; San José Mun. Code, former § 3.28.955, subd. (B).)

The 1989 Ordinance plainly limits pension benefits.  It adds a section entitled "<u>Benefits Limitations</u>."  Moreover, this section expressly subjects the "benefits payable to any person who becomes" or "who became" a member of the plan to the "limitations

_____

[9]  This new provision of San Jose Municipal Code, section 3.28.955, provided in full:  "<u>Benefit Limitations</u>  [¶]  A. Notwithstanding any other law, the benefits payable to any person who becomes a member of this System on or after January 1, 1990 shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code as applied (other than paragraph (2)(G)) without regard to paragraph (2)(F) of said Section 415.  [¶]  B. Notwithstanding any other law, the benefits payable to any person who became a member of this System prior to January 1, 1990, shall be subject to the greater of the following limitations as provided in section 415(b)(10) of the Internal Revenue Code:  [¶] 1. The limitations set forth in Section 415 of the Internal Revenue Code; or [¶] 2. The accrued benefit of the member without regard to any benefit increases pursuant to any amendment of this system adopted after October 14, 1987.  [¶]  C. For the purposes of the application of Section 415(b) of the Internal Revenue Code, actuarial equivalences shall be based on a five percent (5%) interest rate and the 1983 Group Annuity Table for Males with a two-year setback."

18

set forth in Section 415." As a consequence, the section is naturally read to impose limits on the payments received by FCERS plan members.

This interpretation is supported by the handbook that the City distributed to FCERS members in 1995. That handbook tells retirees that Congress has "imposed limitations on pension plan allowances and benefits" and that "[t]hese limitations may reduce the allowance and benefits that you would otherwise receive from the City after you retire." The handbook then describes how these limitations affect the pension benefits received by FCERS members. It tells pre-1990 members that "[y]ou will receive" at a minimum the benefits promised under the formula in effect on October 14, 1987, and if greater benefits are available under either Section 415 or the formula in effect on the day of retirement, "you will receive the lesser" of those two amounts. Similarly, the handbook tells post-1990 members that "your retirement allowance" will be the lower of "[y]our benefit under the formula in effect as of the day you retire" or "[t]he dollar limit set by Section 415." The 1997 and 2004 handbooks contain similar statements.

Plaintiffs contend that, rather than limiting the pension payments received by FCERS members, the 1989 Ordinance merely imposed "a tax-qualification cap." Plaintiffs, however, never explain what a "tax-qualification cap" is. We understand them to be arguing that a tax-qualification cap is a limit on the benefits that may be paid out of a tax-qualified fund rather than a limit on the total amount that a retiree may receive from the fund and other sources. But while Plaintiffs point out that Section 415 only limits payments from tax-qualified plans, they fail to point to any language in the 1989 Ordinance suggesting that the 1989 Ordinance only limits payments from tax-qualified plans.. Nor are they able to point to any promise in the FCERS plan to pay benefits from a source that is not tax-qualified: To the contrary, they rely on the plan's promise to pay them benefits "from the Retirement Fund," which they do dispute is a tax-qualified plan. (San José Mun. Code, former § 2904.1401.) Finally, Plaintiffs fail to reconcile their

19

contention that the 1989 Ordinance imposes only a "tax-qualification cap" with the 1995, 1997, and 2004 handbooks informing members that Section 415's limits "reduce the allowance and benefits that *you would otherwise receive* from the City" and describing the benefits "[*y*]*ou will receive*" without any suggestion that payments from non-tax qualified sources might replace these reductions. (Italics added.)

Plaintiffs point to a memorandum from the City's director of personnel recommending the 1989 Ordinance, which they note "did not mention a total pension cap." But they fail to explain why the director would have been expected to use that phrase. Even more important, they ignore the director's statement that under the proposed ordinance "no employee hired after January 1, 1990 will receive retirement benefits in excess of the 415 limit," which directly contradicts their contention that the 1989 Ordinance limits tax-qualified benefits but not benefits overall. Plaintiffs similarly ignore the director's observation that the proposed ordinance was discussed with City employee groups because "retirement benefits are subject to the Meet and Confer process." This statement suggests that the director believed that the 1989 Ordinance would not merely affect the fund from which the City paid retirees, but instead would reduce the total payments received by retirees and therefore was a mandatory subject of bargaining. (See, e.g., *Bolin v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 914.) Thus, to the extent that the October 1989 memorandum sheds any light on Plaintiffs' interpretation, it contradicts that interpretation.

Plaintiffs' reliance on the 2011 Ordinance is also misplaced. Plaintiffs assert that the 2011 Ordinance "imposed, for the first time, a total pension cap." The memorandum from the city attorney recommending the ordinance suggests just the opposite. In that memorandum, far from suggesting that the 2011 Ordinance would impose a new limit on total benefits, the city attorney informed the mayor and the city council that the 2011 Ordinance contained amendments that "were primarily technical in nature" and had been recommended by outside tax counsel to conform to "the very specific language that [the

20

IRS] wants to see in the Plan documents" in preparation for a qualification review. Moreover, in discussing the amendments to provision concerning Section 415's limits, the city attorney stated that "[t]hese amendments should have no impact on Plan or System operations." This statement cannot be reconciled with Plaintiffs' contention that the 2011 Ordinance imposed caps on total pension payments for the first time.

Even more important, the text of the 2011 Ordinance contradicts Plaintiffs' interpretation. Consistent with the city attorney's representation that the 2011 Ordinance merely made technical changes, under the ordinance subdivision (A) of San José Municipal Code section 3.28.955, which addresses payments to post-1990 members, remained largely untouched: The only change to the provision was the addition of internal references to subsequent subdivisions. (San José Mun. Code, § 3.28.995, subd. (A) [adding statement "except as provided in subsections B and E, below"].[10])

The language of subdivision (B), which deals with payments to pre-1990 members, was modified in 2011, but its substance remained unchanged. As originally enacted, the subdivision made the "benefits payable" to pre-1990 members subject to "the greater" of Section 415's general limit or the grandfathered limit—namely, "[t]he accrued benefit of the member without regard to any benefit increases pursuant to any amendment of [the FCERS] adopted after October 17, 1987." (San José Ord. No. 23283, § 2, adding San José Mun. Code, § 3.28.955, subd. (B).) As amended by the 2011 Ordinance, subdivision (B) of section 3.28.995 of the San José Municipal Code states that "the section 415(b) limit shall not be less than the accrued benefit of the member under this System determined without regard to any amendment of the plan made after

---

[10] As amended in 2011, subdivision (A) of section 3.28.955 states in full: "A. Notwithstanding any other law, except as provided in subsections B and E, below, the benefits payable to any person who becomes a member of this system on or after January 1, 1990, shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code as applied (other than paragraph (b)(2)(G)) without regard to paragraph (b)(2)(F) of said Section 415." (San José Mun. Code, § 3.28.955, subd. (B).)

21

October 14, 1987."[11]  While shorter and simpler, the amended provision is substantively equivalent:  It still provides that pre-1990 members will receive their grandfathered benefits if those benefits exceed Section 415's general limit.  Nothing in these provisions suggests that the City was imposing a limit on total pension payments for the first time.

Plaintiffs' remaining arguments about the 1989 Ordinance are unpersuasive as well.  For example, in asserting that the 2011 Ordinance imposed a "total pension cap" for the first time, Plaintiffs point to a section added by the 2011 Ordinance, subdivision (E) of section 3.28.955.  That subdivision states that "a member may not receive an annual benefit that exceeds the limits specified in section 415(b)(1)(A) of the Internal Revenue Code."  (San José Mun. Code, § 3.28.955, subd. (E)(1).)  Plaintiffs, however, fail to identify any material difference between the limitation imposed in that section—that "benefits payable" to members "shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code" (San José Ord. No. 28885, § 21, amending San José Mun. Code, § 3.28.955)—and the limitation imposed by the 1989 Ordinance, which similarly states that "benefits payable" to members "shall be subject to the limitations set forth in Section 415 of the Internal Revenue Code."  (San José Ord. No. 23283, § 2, amending San José Mun. Code, former § 3.288.955, subd. (A).)

Indeed, the 2011 Ordinance's one change to the provision in the 1989 Ordinance restricting payments to employees hired after January 1, 1990 is the addition of an exception for, among other things, subdivision (E).  (San José Ord. No. 28885, § 21, amending San José Mun. Code, § 3.28.955 ["except as provided subsections B and E below"].)  If, as Plaintiffs assert, the language incorporated from the 1989 Ordinance

_____

[11]  As amended in 2011, subdivision (B) of San José Municipal Code section 3.28.955 states in full:  "Effective January 1, 1990, this paragraph shall apply only to persons who became a member of this system prior to January 1, 1990.  For purposes of this paragraph, these members are referred to as 'qualified participants.'  For a qualified participant, the 415(b) limit shall not be less than the accrued benefit of the member under this System determined without regard to any amendment of the plan made after October 14, 1987."

22

imposed only a "tax-qualification limitation" while the new subdivision (E) imposed a "total payment cap," the two provisions would address different subjects, and it would make no sense to make the new total payment cap an exception to the tax-qualification limitation. Here again, Plaintiffs' interpretation of the San José Municipal Code cannot be reconciled with the actual language of the code.

Plaintiffs also point to a 1990 Ordinance stating that members shall receive a retirement allowance under a particular formula "from and after the effective date of such member's retirement and during the remainder of his or her lifetime." (San José Ord. No. 23485, amending San José Mun. Code, § 3.28.1110.) But this provision does not give Plaintiffs a right to any payments beyond the limits imposed in the 1989 Ordinance. Indeed, the 1990 Ordinance states that it is "[s]ubject to other provision of this Chapter"—that is, to chapter 3.28 of the San José Municipal Code, the chapter containing the 1989 Ordinance. (San José Mun. Code, § 3.28.1110, subd. (B).) Even more important, because the 1990 Ordinance states that members are entitled to payments "from the retirement fund" (*ibid*.), a tax-qualified benefit plan, payments under the ordinance would be restricted by the limits imposed in the 1989 Ordinance even if, as Plaintiffs' assert, those limits apply only to payments from a tax-qualified benefit plan.

Plaintiffs note that the City "did not implement 415(b) limits until 2014," did not mention the 1989 Ordinance in any of the letters informing Plaintiffs that they may have been overpaid retirement benefits, and it sought to obtain an acknowledgment from some plaintiffs that their benefits were subject to the limits in section 3.28.955 of the San José Municipal Code. Apparently, Plaintiffs consider these facts as evidence of a practical interpretation. However, as evidence of the City's practical interpretation, this evidence pales in comparison to the 1995, 1997, and 2004 handbooks expressly discussing the impact of the 1989 Ordinance on the benefits received by retirees. Finally, in a supplemental letter brief, Plaintiffs asserted that the 1975 Plan did not authorize the City to reduce pension benefits due to later changes in federal tax law. Because this argument

23

was not raised in either the opening brief or the reply, it has been forfeited. (See, e.g., *Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 936.) In any event, Plaintiffs fail to show how, despite the grandfather clause in the 1989 Ordinance, their pensions were reduced below the amounts promised in the 1975 Plan.

In short, we find no persuasive basis for Plaintiffs' contention that the 1989 Ordinance imposes a mere tax-qualification cap and conclude that the ordinance instead imposes a cap on pension payments received by retirees.

        2.     <u>Plaintiffs' Table</u>

Relying on a table in their opening brief, Plaintiffs assert that they have presented evidence of "disadvantageous modifications." In fact, at most Plaintiffs have shown reductions in pension payments, not that these reductions deprived them of any vested rights.

At the outset, it should be noted that Plaintiffs' table is not properly before this court. The table lists reductions for each plaintiff along with paragraph and exhibit numbers from their declarations, the year of first reduction, and a projected lifetime loss. Although Plaintiffs assert that this table provided "conclusive proof to the trial court," in fact, the table was not included in the briefing submitted below and was instead created on appeal. In addition, in violation of express requirements of appellate procedure, the table contains no citations to the appellate record. (Cal. Rules of Court, rule 8.204(a)(1)(C) [requiring each brief to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].) As a consequence, we have discretion to disregard the table. (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

In any event, the declarations and exhibits referenced in the table do not show violation of any pension rights that had vested. For example, the first entry in the table concerns plaintiff Bass and references two paragraphs in his declaration and an exhibit.

24

The declaration, however, states that Bass was informed that his pension benefits exceeded the "IRC 415(b) maximum limit" and were being adjusted in "payment stubs," and while those stubs indicates that reductions were made, they indicate that these reductions were for "415 Reduction COLA" and "415ReductCOLA."  As this indicates that the reductions were based on Section 415's limits—which, as shown above, were adopted in the 1989 Ordinance, applied only prospectively, and therefore did not violate any rights that had vested—the Bass declaration and the exhibit attached to it fail to raise any triable issue concerning impairment.  The other evidence cited in the table is similar.  As a consequence, Plaintiffs' table fails to raise any triable issue concerning violation of vested rights.

### 3. Loss of Grandfathered Status

Plaintiffs assert that six individuals—Lawrence Castellano, Richard Coco, Anita Phagan, Wayne Tanda, Randal Turner, and Robert Wilson—"lost grandfather status" and "suffered substantial pension reductions."  According to Plaintiffs, these individuals lost their grandfathered status under the 1989 Ordinance when they purchased service credits or elected the 100 percent survivor benefit for their surviving spouses.  However, Plaintiffs cite no evidence supporting this assertion.  The six employees submitted declarations stating that they lost their "grandfather" status by making these elections.  However, none of these Plaintiffs presented any evidence that their benefits were reduced below the amounts owing under the grandfather clause.  Instead, they merely noted that their monthly payments were reduced without showing that they were reduced below the level permitted by their grandfathered status.

In their opening brief, Plaintiffs pointed to a footnote in a memorandum they submitted in the trial court.  But that footnote merely states that other employees were permitted to sell back service credit because they had not been properly counseled on the impact on their retirement benefits.  There is no evidence that the impact was the loss of grandfathered rights, much less that the six plaintiffs at issue here suffered such a loss.

25

At oral argument, Plaintiffs pointed to a footnote in a 2015 report on the FCERS plan from an outside consultant, which states that certain enhancements, including service purchases, "disqualify members from being 'grandfathered.' "  The footnote, however, does not cite any support for this assertion, and even more importantly, there is no evidence that such disqualifications were ever implemented, much less against Plaintiffs.

As a consequence, Plaintiffs have failed to demonstrate a triable issue of fact concerning whether the six plaintiffs at issue were deprived of their grandfathered rights. (See, e.g., *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1449 [where the defendant shows that evidence of an element is lacking "the burden shifts to the plaintiff to set forth 'specific facts' beyond the pleadings that show a triable issue of one or more material facts as to the cause of action or defense"].)

### 4.    Section 415

Plaintiffs makes several arguments about Section 415.  We find these arguments unpersuasive.

For example, Plaintiffs assert that the trial court erred in ruling that the 1989 Ordinance restricts pension benefits to the limits imposed by Section 415 because that section only prohibits the City from "paying from the City's tax qualified fund pension benefits exceeding 415(b) limits" and the City could have paid benefits above Section 415(b)'s limits by, among other things, setting up an excessive benefits fund or paying excess benefits out of the City's general fund.  Be that as it may, the 1989 Ordinance does not impose a "tax-qualification cap"; it places a cap on the pension benefits payable to plan members set at the limits imposed by Section 415.

Plaintiffs also assert that the trial court erred in concluding that the City had no obligation to establish an excess benefit plan, which it could have done under Section 415(m).  The City, however, did not promise to pay pension benefits above the Section 415's limits except to the extent those benefits fall within the grandfather clause

26

allowed by Section 415.  Moreover, to the extent that Plaintiffs are suggesting that the City nonetheless had a duty to set up a Section 415(m) excess benefit plan, they are wrong.  Section 415(m)(1) permits government plans to create a "qualified governmental excess benefit arrangement," but nothing in it *requires* a government employer to do so.

Plaintiffs also rely on the Illinois Supreme Court's decision in *Matsuda v. Cook County Employees' & Officers' Annuity & Benefit Fund* (Ill. 1997) 687 N.E.2d 866 (*Matsuda*), which held that Section 415 does not prevent government plans from setting up excess benefit plans and paying benefits beyond Section 415's limits.  In *Matsuda,* however, an Illinois statute required the pension benefit plan at issue to set up an excess benefit fund.  (*Id*. at pp. 868-869 [discussing Ill. Pension Code, § 1-116].)  In addition, unlike here, the plaintiff's pension payment in *Matsuda* was not reduced due to a previously enacted cap.  It was reduced on the assumption that federal law prohibited his pension fund from establishing an excess benefit fund.  (*Id*. at p. 868.)  The Illinois Supreme Court's rejection of this mistaken assumption provides no support for Plaintiffs' denial that the 1989 Ordinance imposed limits on their pension payments.

### 6.  The *Allen I* Test

Finally, Plaintiffs argue that the trial court misapplied the test in *Allen I*, *supra*, 45 Cal.2d 128.  As Plaintiffs note, the *Allen I* test is a three-part inquiry used to determine whether " '[a]n employee's vested contractual pension rights may be modified.' " (*Alameda County*, *supra*, 9 Cal.5th at p. 1077.)  This test does not apply where a limit or modification is authorized by the existing terms of a pension plan because "the contract clause does not protect public employees against adverse changes in the manner in which a pension plan is implemented that are authorized by the existing terms of the plan."  (*Id*. at p. 1083; see also *Cal Fire*, *supra*, 6 Cal.4th at p. 995 ["Because we conclude that California's public employees have never had a contractual right to the continued availability of the opportunity to purchase ARS credit, the question whether PERPA worked an unconstitutional impairment of protected rights does not arise."]; *International*

27

*Assn. of Firefighters*, *supra*, 34 Cal.3d at p. 302 [finding no impairment of obligation because changes in pension rights "were made *pursuant* to the charter and ordinances which delineate City's retirement system and prescribe the employees' vested rights"]; *Gatewood v. Board of Retirement of the San Diego County Employees' Retirement Assn.* (1985) 175 Cal.App.3d 311, 320-321 ["Having construed the 1980 amendment of section 31720 as effecting no perceptive change in Gatewood's vested pension rights, we now find review under the *Allen-Abbott* guidelines unnecessary." (fn. omitted)].) As shown above, that is the case here because the 1989 Ordinance authorized the limits later applied to Plaintiffs' pension payments.

In sum, we conclude that Plaintiffs have not shown any impairment of vested pension rights and that the trial court correctly granted summary adjudication of their impairment claims.

## C. *The "Ancillary" Claims*

In addition to claiming unconstitutional impairment based on the alleged failure of the City to pay vested benefits, Plaintiffs also assert four "ancillary" claims based on misrepresentations and omissions concerning those benefits: a "fraud or estoppel-type claim" alleging loss of grandparent status by six plaintiffs; equitable estoppel; promissory estoppel; and breach of fiduciary duty. Because these claims are for damages against a public entity, they are subject to a threshold procedural requirement imposed by the Government Claims Act required: They must be "presented" to the City "not later than one year after the accrual of the cause of action." (Gov. Code, §§ 905, 911.2, subd. (a).) However, two plaintiffs (Harry Freitas and Barry Ng) do not appear ever to have presented claims to the City, and the remaining plaintiffs did not present their joint claim until November 30, 2016, even though they were informed that their pension allowances might be reduced in 2014 or early 2015, more than a year earlier. Because of the delay in presenting these claims to the City, the trial court did not reach the merits of the claims

28

and instead granted summary adjudication on the ancillary claims of all Plaintiffs except Loewen—who subsequently voluntarily dismissed her claims to facilitate her appeal.

Plaintiffs do not dispute that they failed to present a government claim with a year after the City notified them that it planned to enforce the payment limits imposed by the 1989 Ordinance and their "ancillary" claims first accrued. Instead, Plaintiffs argue that the trial court should have applied the continuous accrual doctrine and found their government claims timely with respect to claims that arose later. Some plaintiffs also argue that their government claims were timely due to tolling agreements they signed with the Board. Because the facts relevant to these arguments are undisputed, we review these arguments de novo. (See, e.g., *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1187, 1191 (*Aryeh*); *Jolly v. Eli Lilly & Co.* (1998) 44 Cal.3d 1103, 1112.) We conclude that these arguments are unavailing and that the Government Claims Act bars consideration of the merits of Plaintiffs' ancillary claims.

### 1. The Continuous Accrual Doctrine

The continuous accrual doctrine does not help Plaintiffs because their "ancillary" claims are not based on repeated wrongdoing, which the doctrine requires.

As the Supreme Court has observed, the continuous accrual doctrine applies when "there is a continuing or recurring obligation." (*Aryeh*, 55 Cal.4th at p. 1199.) Under the doctrine, "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." (*Id.* at p. 1192.) In such circumstances, "each new breach" of a continuing or recurring obligation "provides all elements of a claim—wrongdoing, harm and causation [citation] . . . ." (*Id.* at p. 1199.) Consequently, "each may be treated as an independently actionable wrong with its own time limit for recovery." (*Ibid.*)

However, the continuous accrual doctrine does not apply when only the harm continues. "The context of continuing—that is, periodic—breach is to be distinguished

29

from that of a single breach or other wrong which has a continuing impact." (*Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co*. (2004) 116 Cal.App.4th 1375, 1389.) When there is no new wrongdoing, and the only thing that continues is the injury caused by the original wrong, the continuing accrual doctrine does not apply. Instead, "[t]he time bar starts running when the plaintiff first learns of actionable injury [citation], even if the injury will linger or compound." (*Vaca v. Wachovia* (2011) 198 Cal.App.4th 737, 745 (*Vaca*) [holding continuing injuries from previous fraud do not restart limitations period]; see also *NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1237, fn. 10 [holding the continuous accrual doctrine inapplicable to new broadcasts of a reality television series because the broadcast of new episodes was "not a new breach, but rather additional harm" from the original improper exploitation of the plaintiff's idea]; *Sonbergh v. MacQuarrie* (1952) 112 Cal.App.2d 771, 773-774 ["As a general rule, where an injury, although slight, is sustained in consequence from the wrongful act of another, and the law affords a remedy thereof, the statute of limitation attaches at once," and it is immaterial that "actual or substantial damages do not occur until a later date"].)

For example, in *Vaca, supra*, 198 Cal.App.4th 737, the plaintiff alleged that defendants aided and abetted her estranged husband in taking out fraudulent mortgages on two properties. Although the plaintiff discovered the fraud in 2005 and successfully sued her husband, she continued to suffer injury from the fraud and eventually lost both properties as a result. (*Id*. at pp. 742, 745.) In 2009, two years after losing the first property, the plaintiff sued defendants for aiding and abetting her husband's fraud and for breach of fiduciary duty, but the court of appeal held that the statute of limitations had begun running in 2005 when the plaintiff learned of her husband's fraud, and therefore the statute of limitations barred her claims by the time she sued the defendants in 2009. (*Id*. at pp. 744-746.) In so doing, the court rejected the plaintiff's argument that her injuries in 2007 and 2010 restored the limitations period under the continuing injury

30

doctrine. (*Id*. at p. 745.) "[C]ontinuing injury from a completed act," the court observed, does not extend the statute of limitations. (*Ibid*.) Instead, "[t]he time bar starts running when the plaintiff first learns of actionable injury [citation], even if the injury will linger or compound." (*Ibid*.)

Plaintiffs' ancillary claims are similar. While Plaintiffs' impairment claim is based on the City's continuing obligation to make pension payments that they allege the City repeatedly has violated, and therefore is subject to the continuous accrual doctrine, their ancillary claims are not based on any continuing obligations. Instead, much like the claims of the plaintiff in *Vaca*, Plaintiffs' ancillary claims are for fraud and breach of fiduciary duty (as well as estoppel). Even more important, they allege a "continuing injury from a completed act." Plaintiffs contend that before their retirement, the City misrepresented their future pension allowances by failing to disclose the limits that might be imposed, and failed to warn them that purchasing service credits or electing the 100 percent survivor option might subject them to further limits. Because they relied on the City's misrepresentations and omissions, Plaintiffs have been injured by the reduction in their pension benefits. Moreover, that injury continues and worsens every time Plaintiffs do not receive the pension payments that they allegedly were led to expect. Nonetheless, the misrepresentations and omissions on which the ancillary claims are based were all made at or before Plaintiffs' retirement, and they started suffering injury from this alleged wrongdoing when the City first began adjusting and reducing their benefits, for most of the Plaintiffs in 2014. As a consequence, Plaintiffs' ancillary claims do not allege that any continuing obligation was breached, and therefore with respect to these claims there is no "new breach" that "provides all the elements of a claim— wrongdoing, harm and causation"—of the sort needed to trigger a new statute of limitations period under the continuous accrual doctrine. (*Aryeh*, *supra*, 55 Cal.4th at p. 1199.)

31

Plaintiffs cite two cases in which courts applied the continuous accrual doctrine to pension benefit payments: *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 462-464 (*Abbott*) and *Baxter v. State Teachers Ret. Sys.* (2017) 18 Cal.App.5th 340, 381-382 (*Baxter*). However, as the Supreme Court has recognized, "[t]o determine whether the continuous accrual doctrine applies here, we look . . . to the nature of the obligation allegedly breached." (*Aryeh*, *supra*, 55 Cal.4th at p. 1200.) In *Abbott* and *Baxter*, the obligations were to make recurring pension payments. (*Abbott*, *supra*, 50 Cal.2d at p. 445; *Baxter*, *supra*, 18 Cal.App.5th at pp. 349-350; *see also Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal.App.4th 1288, 1296 [applying the continuous accrual theory to annual transfers of tax receipts].) As a consequence, these cases involved obligations that were repeatedly breached by the failure to pay such as Plaintiffs' impairment claim. These cases provide no support for extending the continuous accrual doctrine to Plaintiffs' claims for fraud, estoppel, and breach of fiduciary duty, which, as shown above, are based on wrongdoing that has been completed but is still causing injury.

We therefore conclude that the continuous accrual doctrine does not apply to Plaintiffs' ancillary claims.

### 2. Tolling Agreements

Eight plaintiffs argue that, even if the continuous accrual doctrine does not apply, the government claim submitted for their ancillary claims was timely in light of tolling agreements they signed in September 2014, January 2015, and March 2015. Although these agreements "act[ed] to toll completely any possible statutes of limitation, laches or any other time-bar defenses," they do not preserve these ancillary claims of these eight plaintiffs against the City because the tolling agreements were not with the City. These plaintiffs entered into tolling agreements with the Board, which is a separate and distinct legal entity from the City, and, as noted above, Plaintiffs have dropped their appeal of the judgment in favor of the Board.

32

Plaintiffs contend that the tolling agreements bind the City, but the plain language of the agreements, which are largely identical, belies that contention. The first paragraph of each agreement identifies the parties to the agreement as "the Board of Administration ('Board') of the Federated City Employees' Retirement System ('Federated')" and "the undersigned retired member." The eighth paragraph of each agreement states that it "shall be binding on and inure to the benefit of the Parties and their respective trustees, representatives, directors, officers, employees, estates, beneficiaries, successors, and assigns." And each agreement has signature lines for the "FEDERATED CITY EMPLOYEES RETIREMENT SYSTEM" and the "RETIRED MEMBER." Indeed, there is no mention of the City in any of the agreements beyond a provision allowing for notice to be sent to the eight plaintiffs in question at "his or her address of record at the City of San Jose Department of Retirement Services" or such other address as the retiree may designate.

Plaintiffs assert that Roberto Peña, who signed the tolling agreements in his capacity as Secretary of the FCERS Board and Director of the Department of Retirement Services, was "an agent of the City and acting on its behalf." In support of this assertion, Plaintiffs point to their briefing in the trial court, a page from one of their tolling agreements containing the notice provision, San Jose Municipal Code provisions concerning the powers and duties of department heads (San José Mun. Code, § 2.04.040), and the establishment of the Department of Retirement Services (*id*., at § 2.04.3100). None of this suggests that Peña had the authority to sign the tolling agreements on behalf of the City, much less that he exercised that authority.[12]

---

[12] Citing a footnote in the introduction to a brief filed in the trial court, Plaintiffs also assert that they raised defenses requiring factual determinations. To the extent that these defenses are separate from the tolling agreements, they were not properly raised below and have been forfeited. (See, e.g., *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 436.)

Accordingly, we conclude that the tolling agreements do not bind the City and do not render timely the government claim against City.

This court acknowledges that the conclusion that the Government Claims Act bars Plaintiffs' ancillary claims will be disappointing to them. Plaintiffs are all long-time public servants whose contributions and sacrifices the court appreciates, and they have alleged that they were misled by misrepresentations and omissions concerning their pensions. If these allegations are true, Plaintiffs have suffered unfair surprise, lost opportunities, and other injuries to their richly deserved retirements, and these losses are compounded by the loss of the opportunity to prove the merits of their claims. However, this court must follow the law, which precludes the assertion of claims against public entities, whatever their merits, that have not been timely presented to those entities under the Government Claims Act.

## III.   DISPOSITION

The appeal in H050036 of the judgment against Evet Loewen in favor of the Board of Administration of the Federated City Employees Retirement System is dismissed. The judgments in H049387 and H050036 are affirmed.

34

 

 

 

 

                    _____

                    BROMBERG, J.

 

 

WE CONCUR:

 

 

_____

BAMATTRE-MANOUKIAN, ACTING P. J.

 

 

_____

DANNER, J.

 

 

 

*Preservation of Benefit Plan Retirees Association et al. v. City of San Jose et al./*
*Loewen v. City of San Jose*
H049387/H050036